Filed 5/29/15  In re Leonardo A. CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re LEONARDO A., a Person Coming Under the Juvenile Court Law. | B256710 |
| _____ | (Los Angeles County |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | Super. Ct. No. DK02907) |
| Plaintiff and Respondent, | |
| v. | |
| LEONARDO A., Sr., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Annabelle Cortez, Judge.  Affirmed in part and reversed in part with directions.

Patti L. Dikes, under appointment by the Court of Appeal, for Defendant and Appellant.

Mark J. Saladino, County Counsel, Dawyn R. Harrison, Assistant County Counsel, and Jacklyn K. Louie, Principal Deputy County Counsel.

Leonardo A., Jr. (Leonardo), born January 2009, is the child of Leonardo A., Sr. (father) and R.H. (mother). Prior to the events described in this opinion, Leonardo lived with both parents, his thirteen-year-old half-sister Z., and his baby brother Adrian. On December 7, 2013, Adrian was brought to the hospital not breathing, with significant intracranial bleeding and a broken rib. He died ten days later after being removed from life support.

Doctors suspected that Adrian's injuries may have been nonaccidentally caused by father, who had been caring for Adrian immediately before he was injured and who claimed to have dropped Adrian accidentally while preparing a bottle. The juvenile court concluded that Adrian was the victim of child abuse and assumed jurisdiction over Leonardo. The court ordered Leonardo removed from father's custody and denied father any reunification or enhancement services. Father appealed.[1]

We affirm the finding of jurisdiction, but reverse the dispositional order removing Leonardo from father's custody, concluding it was not supported by clear and convincing evidence of substantial danger to Leonardo. Although several of Adrian's doctors said they were suspicious that Adrian's injuries *may* have been intentionally caused, none opined that he or she believed they *had* been intentionally caused, and although the juvenile court held three separate hearings on the jurisdictional and dispositional issues, no doctor or medical expert ever testified. As a result, the juvenile court did not have the benefit of a medical expert to interpret test results, explain their significance, or render an opinion on the ultimate question of whether Adrian had been the victim of intentional child abuse. In short, although our record is replete with *suspicions* of child abuse, such suspicions fall well short of the high probability that the clear and convincing evidence standard requires. Further, there was no evidence that Leonardo, who had lived with father his entire life, had ever been abused.

---

[1]     Counsel for father and DCFS both filed notice of their intention to waive oral argument before this court. However, because of the significance of the issues raised in this case, we directed all counsel to appear for argument.

For all of these reasons, we conclude that the record lacks clear and convincing evidence of substantial danger to Leonardo if he were to remain in father's custody. We are mindful, however, of the fact that nearly a year has passed since the juvenile court entered its dispositional order, and thus there may be new information and evidence available to the parties and the court. We therefore do not order Leonardo immediately returned to father's custody, but instead remand this matter to the juvenile court with directions to hold a new dispositional hearing under Welfare and Institutions Code section 361, subdivision (c).[2]

## FACTUAL AND PROCEDURAL BACKGROUND

## I.

### Death of Leonardo's Infant Brother

On December 7, 2013, Leonardo's six-week-old brother, Adrian, was brought to the hospital in full cardiac arrest. Father reported that he had been home alone with Adrian while the rest of the family was at Z.'s soccer game. Adrian woke up crying, and father picked him up and held him while preparing a bottle. As father opened a bottle of water to mix with formula, Adrian slipped through father's left arm and fell four feet to the kitchen floor. Father said Adrian cried, then stopped crying, closed his eyes, and began to breathe slowly. Father grabbed the bottle of milk and placed it in the baby's mouth, but Adrian's eyes and mouth remained closed. Father called 9-1-1 and, at the operator's directions, performed CPR until the paramedics arrived. Father said he called the paramedics within a minute or two of Adrian's fall.

Adrian did not have a pulse when he arrived at the hospital emergency room and he was placed on a ventilator. His documented time without a pulse was about 38 minutes. A brain MRI revealed global hypoxic-ischemic encephalopathy and bilateral subdural hematomas.[3] Hospital records state that "[s]uspicion for nonaccidental trauma

---

[2]     All subsequent statutory references are to the Welfare and Institutions Code.

[3]     Hypoxic-ischemic encephalopathy "is the brain injury caused by oxygen deprivation to the brain, also commonly known as intrapartum asphyxia." (<http://cerebralpalsy.org/about-cerebral-palsy/cause/hypoxic-ischemic-

3

was high." Subsequent tests indicated that Adrian had no corneal, gag, or cough reflex, no spontaneous movements in his extremities, and a hemorrhage of his right retina. Doctors observed bruising along the left side of Adrian's neck.

The hospital social worker said hospital personnel suspected Adrian's injuries were not accidentally caused. A doctor's note in Adrian's chart said, "Rare to have short fall cause extensive injury."

On December 13, the parents were told that Adrian's prognosis was extremely poor and they would have to decide whether to keep him on life support. Adrian's pupils appeared not to react to light and he did not respond to loud noises. Both parents were described as visibly upset and crying. On December 17, the parents agreed to remove Adrian from life support, and he died the same day.

## II.

### Detention

The hospital made a referral to the Los Angeles County Department of Children and Family Services (DCFS), which began an investigation. Mother told a children's social worker (CSW) that she had known father for five years and lived with him for four years. She denied any domestic violence. She said that on December 7, the family had planned to attend Z.'s morning soccer game together, but because it was very cold, she took Z. and Leonardo to the game, and father stayed home with Adrian. Just after noon, father called her and said he had accidentally dropped the baby and she should come home. She said father was a great husband and father, she trusted him completely, and she believed Adrian's injuries were accidental.

---

encephalopathy/> [as of May 29, 2015].) A subdural hematoma, also called a subdural hemorrhage, occurs "when blood vessels — usually veins — rupture between [the] brain and the outermost of three membrane layers that cover [the] brain (dura mater). The leaking blood forms a hematoma that compresses the brain tissue. If the hematoma keeps enlarging, a progressive decline in consciousness occurs, possibly resulting in death." (<http://www.mayoclinic.org/diseases-conditions/intracranial-hematoma/basics/causes/con-20019654> [as of May 29, 2015].)

4

Z. told the CSW that mother and father got along well and cared for Adrian together. She had never seen physical violence between them. She said father took good care of her and her brothers, and she denied any physical abuse. She said mother disciplined her when necessary by taking away her phone; father did not discipline her.

The CSW attempted to interview Leonardo but he was sleeping. The CSW did not observe any marks or bruises indicative of physical abuse. Leonardo was clean and appeared to be in good health. Subsequently, he told the CSW that he loved his mommy and daddy.

DCFS reported both Leonardo and Z. appeared to be in good physical health and were doing exceptionally well in school. The family appeared to be strongly bonded. There were no prior DCFS referrals and neither parent had a criminal record.

Adrian's attending physician, Dr. Daphne Wong, told the CSW that doctors had found older and newer bleeds, and she said father's account of dropping Adrian did not account for his extensive injuries. Dr. Wong could not determine whether Adrian's injuries were accidentally or intentionally inflicted, however. Dr. Wong also could not determine whether father had timely called for medical treatment. She said it was "suspicious" how much damage Adrian had suffered from a short fall.

Detective Burke of the Los Angeles County Sheriff's Department said, "Based on injuries that the baby had such as bleeding in the brain and retinal hemorrhaging it points to the baby being shaken. The dad's story is inconsistent. It doesn't explain how the baby has damage to the eye area which couldn't have been caused by the fall."

On December 18, the CSW told the parents that Leonardo would be detained from father and placed with mother. The parents consented and agreed that father would remain in the family home, and mother and the children would move in with the maternal grandmother. Mother said she would do everything she was asked to do to avoid having her other children taken from her. Father said: "I would never do anything to hurt any of my kids. I want to keep us together and even if that means I have to be apart from them for a while I'll do it. It's just real hard because we haven't been apart since [mother] and me got together. I'll do what I need to do to get through this for my family."

5

Based on the extensive injuries to Adrian, DCFS opined that Leonardo appeared to be at risk of physical abuse by father. On January 2, 2014, the court found a prima facie case for detaining Leonardo from father, ordered family maintenance services for mother, and ordered monitored visitation for father.

### III.

### Jurisdiction/Disposition Report

The jurisdiction/disposition report said that mother believed Adrian's injuries were accidental because father had never been abusive to her or any of the children. She said father was very "hands on" with the children and never seemed frustrated when caring for them, even when they cried. Mother said she had never seen father act abusively towards her children or any other children.

Z. said she did not know why father was being blamed for Adrian's injuries because "he has never hit him or us." She said she had never known father to be abusive in any way. She said father took good care of her and her siblings and she liked living with mother and father.

Both maternal grandparents said they were shocked that father was being accused of hurting Adrian because they had known him for more than six years and had never seen him act in an abusive or inappropriate way towards his or any other children. Maternal grandmother said she had asked Z. whether father had ever abused her or her siblings, and Z. said he had not.

Leonardo's preschool teacher described him as a happy child who played well with other children. She had never seen anything unusual about Leonardo, and he had never reported any abuse or neglect.

Leonardo was examined by a physician for possible child abuse on January 14, 2014. The physician found no evidence of abuse. Leonardo said he felt safe with mother and father and liked living with them.

On March 13, 2014, the coroner ruled Adrian's death a homicide. Among other things, the coroner's report noted "very faint and old contusions seen around the bilateral perioral area," a "very faint old contusion noted over the upper aspect of the lateral

6

neck," an "old fracture" to the right paravertebral rib, and "focal areas of hemorrhage at the areas of the bilateral optic nerves." Subsequent microscopic examination of optic nerve and bone tissue suggested the rib fractures and optic hemorrhages had occurred approximately 10-14 days before Adrian's death, i.e., on approximately the day Adrian was brought to the hospital. The report also noted evidence of "subdural hemorrhage of the upper cervical spinal canal which is most likely extending from the subdural hemorrhage of the base of the brain" and "possible subarachnoid hemorrhage noted over the posterior surface of the lumbar spinal cord." The report said that a neuropathology examination of the brain was pending,[4] but the results of that examination, if it occurred, were never made part of the coroner's report.

## IV.

## First Amended Petition

On April 7, 2014, DCFS filed an amended juvenile dependency petition alleging jurisdiction pursuant to section 300, subdivisions (a), (b), (f), and (j), as follows: "On 12/07/2013, [Leonardo's] six week old now deceased sibling, Adrian . . . was hospitalized and found to be suffering from . . . global hypoxic-ischemic encephalopathy, bilateral subdural hematoma, posterior fossa subarachnoid hemorrhage, large left retinal hemorrhage and respiratory failure. The sibling suffered from cardiac arrest and was intubated. The sibling required a blood transfusion. Additionally, the sibling suffered from an old rib fracture of [the] right paravertebral 9th rib. The sibling was pronounced dead[] on 12/17/2013. The cause of death was determined to be traumatic brain injury. The deceased sibling was in the exclusive care, custody and control of the child's father, Leonard[o] [A.] Sr., at the time the deceased sibling was injured. The child's father's explanation of the manner in which the sibling sustained the sibling's injuries is not

---

[4] A subarachnoid hemorrhage "is bleeding in the space between [the] brain and the surrounding membrane (subarachnoid space). Bleeding usually results from the rupture of an abnormal bulge in a blood vessel in [the] brain (brain aneurysm). . . . A subarachnoid hemorrhage may lead to permanent brain damage or death if not treated." (<http://www.mayoclinic.org/diseases-conditions/subarachnoid-hemorrhage/basics/definition/con-20036606> [as of May 29, 2015].)

consistent with the sibling's injuries in that the injuries were extensive. The sibling's injuries are consistent with non-accidental trauma. The sibling's death was determined to be a homicide by the Coroner. Such injuries would ordinarily not occur except as the result of deliberate, unreasonable, and neglectful acts by the child's father . . . ."

## V.

## Adjudication

At a contested jurisdictional hearing on May 5, 2014, county counsel urged the court to sustain all four jurisdictional counts, arguing that "the statements made by Dr. Wong [and] . . . the ultimate finding of the coroner of homicide . . . proves that the sibling's injuries are consistent with nonaccidental trauma."

Father's counsel asked that petition be dismissed in its entirety, urging that there was no evidence that father inflicted nonaccidental trauma on Adrian. Counsel noted: "[A]ll of the individuals interviewed, including the children who are with the mother, report . . . that we have an appropriate person, an adult who has been caring and appropriate around the children, never engaging in domestic violence, any sort of corporal punishment, or any act that would rise to a level of being of concern to those who are involved with this family."

Leonardo's counsel argued that the court should sustain only the section 300, subdivision (f)(1) count (parent caused the death of another child through abuse or neglect). Counsel conceded that Adrian's death had been caused by "this very unfortunate incident," but she urged that DCFS had provided "no evidence of any other sort of physical abuse or any other injury or any kind of intentional harm." Counsel asked the court to dismiss counts (a)(1), (b)(1), and (j)(1), urging that there was "no evidence of risk to Leonardo, Jr., no evidence that he has or will suffer severe injury, either intentionally or because of neglect."

The juvenile court found by a preponderance of the evidence that counts (a)(1), (b)(1), (f)(1), and (j)(1) of the petition were true and that Leonardo was a person described by section 300. The court made the following findings:

8

"[O]n page 12 of the adjudication, disposition report, . . . Dr. Wong indicates that she did observe some bruising on the infant's body but cannot determine if the bruising is a result of physical abuse or were caused during C.P.R. efforts.  [¶]  And Dr. Wong then goes on to explain some of the bruising . . . could have been explained by C.P.R. efforts, and that includes – she stated bruising to the left eye could have possibly resulted from a mask placed on his face during C.P.R. efforts as well as on his neck.  And according to Dr. Wong, she could not conclude how bruising on his left clavicle, left neck side, and behind the ear were caused.

"Page 12 also indicates that Dr. Wong noted – she's also concerned about why infant Adrian's heart stopped.  She stated that 'An infant . . . who' – 'falls to the ground of a short distance does not normally result in the heart to stop.'  [¶] . . . [¶]

"The court . . . notes that, in looking at the totality of the facts, the court can make a reasonable inference that the extent of injuries sustained by Adrian were not consistent with the father's explanation that this was accidental.

"The court would specifically note the information, both in the adjudication report and also in the detention report . . . where Dr. Wong from Children's Hospital was asked a series of questions, including whether the child's injuries were in different stages of healing.

"[Dr. Wong said:]  'He [Adrian] did have two different stages of healing.  There were older bleeds and newer bleeds.  And with respect to whether or not the injuries were accidental, we can't determine that because it is difficult to rule if retinal hemorrhaging is old or new.  I can say that the injuries and how the father said they happened do not account for the extensive damage that Adrian sustained.'

"That section also indicates, according to Dr. Wong, that 'There are phone records that show that he called 9-1-1.  But, if it was the accidental fall that he said happened, then he would have called right away.  And, if he had, maybe there could be a different outcome for Adrian.  Again, the father's story does not match the medical results.  It is suspicious how there was extensive damage from such a short fall.'

9

"The court also notes . . . the information provided from Children's Hospital on page 58 – and this is page 13, and it's also included in the detention report – after the – the MRI pointed to suspicious nonaccidental trauma. And that's – although . . . there were no bone fractures, . . . the injuries were suspicious for nonaccidental trauma. . . .

"The court also notes that Petitioner's Exhibit No. 3 indicates that Adrian's cause of death was a result of traumatic brain injury. The child's death was determined to be a homicide, according to the autopsy report.

"With respect to the timeliness of the call, the court notes the information concerning the initial referral [is] that normally, when a child hits their head such as this, there is normally room in the brain to swell and the child would not go into full cardiac arrest before the paramedics could arrive.

"The court notes the information provided in the detention report [says,] 'It's rare to have such short . . . fall cause . . . extensive injury.' And I'm quoting page 7 of the detention report.

"The court also notes the information on page 8 from Detective Burke. 'Based on the injury that the baby had, such as bleeding in the brain and retinal hemorrhaging, points to the baby being shaken. [Dad's] story is inconsistent. It doesn't explain how the baby has damage to the eye area, which could not have been caused by the fall.'

"The court also notes, as pointed out by [deputy county counsel], that the baby was unquestionably in the sole care and custody of the father when the injuries occurred. And, again, the father's story did not match the medical results . . . concerning the extensive injuries that were . . . suffered by the baby."

## VI.

### Dispositional Hearing

At the dispositional hearing on May 30, 2014, mother testified that since the children had been detained, her relationship with father had been "on hold." Mother said she did not believe father intentionally hurt Adrian. She explained: "[W]e planned our son. . . . With my other kids, you know, we just got pregnant. But with Adrian – he was planned. We wanted him. And just reading that report, I – I can't – you know, I don't

10

believe it. . . . [M]y baby was so loved." When asked whether she believed father was responsible for Adrian's death, she said she did not: "[I]n my heart, I don't. I – he loved him so much. He's – I think this was just – you know, he slipped from his arms while he was making a bottle."

Mother said she was doing everything she could to keep her kids with her and keep them safe. She said she spoke with father two or three times a week, and saw him once or twice a week at the cemetery. She said she would live with father again if the court permitted it.

Mother said interactions between father and Leonardo were "great. . . . My son adores him." She said father and son were "always playing. They're always, you know, playing football, soccer, talking about the Steelers, a football team, cars. I mean, if you were to see them, you know, playing, you could just see the joy in my son's face. He adores his daddy." She said when the family lived together, she and father would jointly bathe Leonardo, read him a story, and put him to bed. Father had been to all of Leonardo's doctor's appointments and attended most of Leonardo's school functions. She had never seen father act inappropriately with Leonardo.

Mother said Leonardo had not seen father in about a month, but talked about him "all the time." Leonardo told mother, "I miss daddy."

Father testified that he and Adrian were home alone when Adrian was injured. He agreed that a couple of doctors told him they did not believe Adrian's injuries were accidental. When asked who he thought was responsible for his son's death, father answered, "He was under my care." Father said, however, that the injuries were inflicted accidentally, when Adrian slipped out of his arms and fell to the floor.

Father said his goal was to reunify with Leonardo: "I want to be able to put my son to sleep, take him to school, do things that we used to do before that I can't do now."

Following the testimony, counsel for DCFS requested that Leonardo remain released to mother, that mother be ordered to participate in parenting classes and individual counseling, that father have no contact with Leonardo or Z., and that father receive no reunification or enhancement services.

Leonardo's attorney noted that father and son had a very close relationship and suggested it would be in Leonardo's best interests to have monitored visitation with father. Leonardo's attorney also asked the court to order enhancement services for father and to provide "an outline of what we would like to see from him to assess if it's . . . possible for him to at some point return home, as both parents have stated would be their intention and desire."

Mother's attorney and father's attorney joined in Leonardo's attorney's request, suggesting that the evidence before the court demonstrated it would be in Leonardo's best interests to permit visitation and offer father enhancement services. Mother's counsel further suggested: "I don't think that the court has enough reason to – to deny Leonardo's father an opportunity to prove himself. . . . [¶] There is no domestic violence, no drugs, no inappropriate fighting or other issues in the home, no shady characters coming around. . . . [T]his is . . . a family that has experienced something horrific and unfortunate. And they are compliant and cooperative with you, Your Honor. [¶] I would ask that you – that you find that it is in Leonardo's best interests to give them this chance to show . . . that they can reunify . . . ." Father's counsel urged similarly. Counsel noted that the court had the option to place Leonardo with mother and terminate its jurisdiction, and that the only reason to keep the case open was for the purpose of allowing father and Leonardo to reunify. Father's counsel said: "The goal of this court is reunification, Your Honor. And I don't believe this court can find that the child would not benefit from . . . reunification-like services, through enhancement services, for the father. . . . [¶] . . . [¶] . . . I believe [father] should be given an opportunity to comply with [enhancement services] to ensure that, perhaps, we may liberalize those visits [between father and son], perhaps even reunifying at a future date."

Following argument, the court ordered Leonardo removed from father and placed with mother, finding by clear and convincing evidence pursuant to section 361, subdivision (c), that there would be a substantial danger if Leonardo were returned home to father and there were no reasonable means to protect Leonardo without removing him from father. In support of its order, the court "adopte[d] by reference the facts noted for

12

the adjudication of this case with respect to the clear and convincing evidence for 361 (c)." The court further ordered mother to participate in family maintenance services, including "parenting, family preservation, individual counseling to address child protectiveness, child death, grief, and other case issues." Finally, because Leonardo would continue to live with mother, the court said that father's entitlement to services was governed by the statutory provisions addressing enhancement services (§ 362, subd. (d)), not reunification services. As to enhancement services for father, the court stated it took into account Leonardo's best interests, and it specifically noted the closeness between Leonardo and father. However, the court said, "that's outweighed by the fact that we have a deceased sibling, where the autopsy – the coroner's report deemed it a homicide and Adrian was strictly under the care of [father]." The court explained:

"[T]he court finds that Leonardo's closeness to [father] is significantly outweighed by the fact that this case involves the death of a child . . . under [father's custody].

"The court cannot make a finding, by clear and convincing evidence, that offering enhancement services, which are discretionary, is in the best interests of the child.

"The court also notes that, during [father's] testimony, while he is participating in services, [father] is still essentially in denial of the sustained petition.

". . . [W]ith respect to . . . the need for the court to retain jurisdiction, the basis for the court adopting the department's recommendation is not just to monitor whether the mother can . . . be protective of Leonardo. That's certainly one of the reasons.

"However, . . . there's also a need to provide services for [mother] given the loss of the child. . . .

"[Mother] at this point, testified that she still believes it was an accident, despite the sustained petition. The court finds that jurisdiction . . . is warranted. So that way [mother] can address child protectiveness, child death, grief, . . . and other related case issues as part of the programs to be . . . referred to by the department. [¶] . . . [¶]

"Again, . . . based on the totality of the circumstances, the seriousness of the reason that this petition came before the court, and, specifically, the death of a child, the court is exercising its discretion to not offer enhancement services to [father].

13

"... [T]he court is not adopting the department's recommendation to not offer visitation to [father]. The court's going to maintain in full force and effect its order ... given that Leonardo is close to [father], monitored visitation, D.C.F.S. office, minimum two to three times per week, minimum two to three hours per visit."

Father timely appealed the jurisdictional and dispositional orders and findings.

## DISCUSSION

Father challenges the juvenile court's jurisdictional and dispositional findings. He contends: (1) the evidence was insufficient to support the court's jurisdictional findings; (2) the evidence was insufficient to support the court's removal order; (3) the court abused its discretion in failing to order reunification services under section 361.5; and (4) the court abused its discretion in failing to order enhancement services.

### I.

### Sufficiency of the Evidence to Establish
### Jurisdiction Under Section 300

Father contends that the evidence was insufficient to establish jurisdiction under section 300, subdivisions (a), (b), (f), and (j), because it "failed to prove father inflicted non-accidental trauma to his son, Leonardo's infant brother Adrian, that resulted in his death, and failed to prove father would place Leonardo at risk of future harm or that Leonardo suffered any physical harm inflicted non-accidentally by father." For the reasons that follow, we do not agree.

In a challenge to the sufficiency of the evidence to support a jurisdictional finding, "the issue is whether there is evidence, contradicted or uncontradicted, to support the finding. In making that determination, the reviewing court reviews the record in the light most favorable to the challenged order, resolving conflicts in the evidence in favor of that order, and giving the evidence reasonable inferences." (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 450-451.) When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, "a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is

14

supported by substantial evidence.  In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence." (*Id*. at p. 451.)

We begin by considering the juvenile court's jurisdictional finding under section 300, subdivision (f).  That section provides that a child is within the jurisdiction of the juvenile court if "[t]he child's parent or guardian caused the death of another child through abuse or neglect."  Father contends Leonardo is not within this section because the evidence did not establish intentional harm.

We do not agree with father that jurisdiction under section 300, subdivision (f) requires evidence of intentional harm.  In *In re Ethan C.* (2012) 54 Cal.4th 610, our Supreme Court considered whether "the lethal neglect to which section 300(f) refers require *criminal* negligence, i.e., a degree of culpable misfeasance or malfeasance that would support the parent's or guardian's *criminal conviction* for causing a child's death[.]" (*Id.* at p. 617.)  In that case, the father transported his 18-month-old daughter in a car without securing her in a child safety seat, and the child was fatally injured when another vehicle collided with the father's car.  There was no indication that father was at fault for the traffic accident. (*Id.* at p. 619.)  Following the child's death, DCFS filed a dependency petition alleging that father's two surviving children came within the jurisdiction of the juvenile court pursuant to section 300, subdivision (f), among other provisions. (*In re Ethan C.*, at p. 620.)  The juvenile court sustained the section 300, subdivision (f) allegation, and father appealed, urging that the allegations under that section could not be sustained on the basis of his mere civil negligence in failing to secure his child in a child safety seat. (*In re Ethan C.*, at p. 622.)  The Court of Appeal affirmed, and father petitioned for review. (*Id.* at p. 623.)

The Supreme Court affirmed.  Among other things, the court concluded that "neglect" within the meaning of section 300, subdivision (f) does not require that the parent be guilty of criminal negligence.  Instead, it is enough that the parent caused a child's death through "a mere want of ordinary care." (*In re Ethan C.*, *supra*, 54 Cal.4th

15

at pp. 626-627.)[5] The court explained: "[T]he Legislature could rationally conclude that when a parent's or guardian's negligence has led to the tragedy of a child's *death*, the dependency court should have the power to intervene for the safety and protection of children remaining in the parent's or guardian's custody, even if the parent's lethal carelessness cannot necessarily be characterized as sufficiently 'gross,' reckless, or culpable to be labeled 'criminal.' " (*Id*. at p. 636.)  Accordingly, because father's failure to secure his young daughter in a child safety seat constituted, "at a minimum, a breach of ordinary care," the juvenile court's findings based upon section 300, subdivision (f) did "not fail on grounds that [father] failed to meet the statutory standard of 'abuse or neglect.' " (*In re Ethan C.*, at p. 637.)

The present case is analogous.  Father has admitted to dropping Adrian while preparing a bottle, and he appears not to dispute that Adrian's fall caused the injuries that precipitated the child's death.  Because the facts of this case constitute, at a minimum, a breach of ordinary care, the juvenile court did not err in sustaining the jurisdictional allegation under section 300, subdivision (f).[6]

---

[5]     The court explained: "Black's Law Dictionary (8th ed. 2004) (Black's) defines the noun 'neglect' as '1. [t]he omission of proper attention to a person or thing, whether inadvertent, negligent, or willful; the act or condition of disregarding' or '2. [t]he failure to give proper *attention*, *supervision*, or necessities, *esp. to a child*, to such an extent that *harm results or is likely to result*.' . . . [¶] . . . [¶]  We also note the definition of 'neglect' contained in the Child Abuse and Neglect Reporting Act. . . .  For purposes of this statute, 'neglect' is defined as 'the *negligent* treatment or the maltreatment of a child by a person responsible for the child's welfare under circumstances indicating harm or threatened harm to the child's health or welfare.  The term includes both acts and omissions on the part of the responsible person.' " (*In re Ethan C.*, *supra*, 54 Cal.4th, at pp. 628-629, fn. omitted.)

[6]     Having so concluded, we need not reach the other statutory grounds on which the juvenile court based jurisdiction. (*In re Alexis E.*, *supra*, 171 Cal.App.4th, at pp. 450-451.)

16

## II.

## Sufficiency of the Evidence to Justify Removing
## Leonardo From Father's Physical Custody
## Under Section 361, Subdivision (c)

Father contends that even if we find the evidence sufficient to support a jurisdictional finding, the dispositional order removing Leonardo from father should be reversed because there was insufficient evidence to support a finding of likely substantial danger under section 361, subdivision (c). For the reasons that follow, we agree.

*A.     Governing Statutory Provisions and Standard of Review*

Section 361, subdivision (c) governs the removal of a child from his or her parents' physical custody. It provides: "A dependent child shall not be taken from the physical custody of his or her parents or guardian or guardians with whom the child resides at the time the petition was initiated, unless the juvenile court finds *clear and convincing evidence* of any of the following circumstances . . . : [¶] (1) There is or would be *a substantial danger* to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's or guardian's physical custody." (Italics added.)

Clear and convincing evidence "requires 'a high degree of probability, such that the evidence is so clear as to leave no substantial doubt. [Citation.]' [Citations.]" (*In re C.M.* (2014) 232 Cal.App.4th 1394, 1401.) " 'The high standard of proof by which this finding must be made is an essential aspect of the presumptive, constitutional right of parents to care for their children.' " (*In re A.E.* (2014) 228 Cal.App.4th 820, 825.) It reflects "the Legislature's recognition of the rights of parents to the care, custody and management of their children, and further reflects an effort to keep children in their homes where it is safe to do so. [Citations.] By requiring clear and convincing evidence of the risk of substantial harm to the child if returned home and the lack of reasonable means short of removal to protect the child's safety, section 361, subdivision (c)

17

demonstrates the 'bias of the controlling statute is on family preservation, not removal.' [Citation.] Removal 'is a last resort, to be considered only when the child would be in danger if allowed to reside with the parent.' [Citation.]" (*In re Hailey T.* (2012) 212 Cal.App.4th 139, 146 (*Hailey T.*).)

On appeal, "[w]e review the record in the light most favorable to the court's order to determine whether there is substantial evidence from which a reasonable trier of fact could find clear and convincing evidence that placement would be detrimental to the child. Clear and convincing evidence requires a high probability, such that the evidence is so clear as to leave no substantial doubt. [Citation.]" (*In re Patrick S.* (2013) 218 Cal.App.4th 1254, 1262; see also *In re Michael G.* (2012) 203 Cal.App.4th 580, 589 ["On review, we determine whether the record contains substantial evidence from which the juvenile court could find clear and convincing evidence."].)

### B. *In re Hailey T.*

In *Hailey T.*, *supra*, 212 Cal.App.4th 139, four-month-old Nathan was diagnosed with a subconjunctival hemorrhage to his right eye after a day in which he had been, at various times, in the custody of his mother, father, and maternal grandmother. Neither the parents nor the grandmother could explain how Nathan had been injured other than suggesting that his three-year-old sister Hailey could have accidentally hurt him while she was combing his hair or playing with him. (*Id.* at p. 142.)

The social worker reported that mother and father had been married for nearly nine years, had no child welfare history, and had no prior reports of physical abuse. The grandmother, who lived a block away, said she had never witnessed domestic violence between mother and father, and said father had a good relationship with the children and played with them after work. Hailey said no one fought or yelled in her home and she denied any physical or sexual abuse. (*Hailey T.*, *supra*, 212 Cal.App.4th at p. 143.)

At the contested jurisdictional hearing, a social worker testified that Nathan's injuries were not consistent with the parents' explanations that Hailey might have caused them. A physician testified that Nathan's injuries were nonaccidental and he appeared to have been struck more than once. The physician could not determine whether Nathan

18

sustained the injuries during a single or multiple episodes, and she testified it was highly unlikely that Hailey inflicted Nathan's injuries. (*Hailey T.*, *supra*, 212 Cal.App.4th at p. 144.)

The juvenile court sustained the dependency petition and found, by clear and convincing evidence, that there would be a substantial risk of harm to both children if they were returned to the family home. Noting the identity of the perpetrator was unknown and the young ages of the children, the court found there were no alternatives to removal and ordered the children placed in the care of relatives. (*Hailey T.*, *supra*, 212 Cal.App.4th at p. 145.) Father appealed.

The Court of Appeal reversed the dispositional order as to Hailey, finding that the record did not support findings that there was substantial danger to Hailey if she were returned home and that there were no less drastic alternatives than removal for protecting her. The court explained as follows:

"The record contains no evidence suggesting Hailey was ever a victim of abuse in the parents' home, or that she suffered any harm as a result of the abuse that the court found with respect to Nathan. Evidence of past abuse is probative in determining whether a child is in need of the juvenile court's future protection [citation], but such evidence alone does not meet the clear and convincing standard of proof required to justify removal of a child from his or her parents' custody, much less to justify removal of a sibling of the abused child. If it did, section 361, subdivision (c)(1) would be superfluous.

"Further, the record in this case provides ample grounds to differentiate between Nathan and Hailey and shows the risk to Hailey of future abuse was strikingly less than the risk facing Nathan. Hailey was not an infant of only a few months old, who would be unable to articulate any abuse to which she might be subjected, and who would be completely isolated from the observations of mandated reporters of abuse. By the time of the disposition hearing, Hailey was a four-year-old child, with good language skills and an outgoing and social nature. She attended school where she had regular contact with teachers and other mandated reporters of any suspected abuse.

19

"Moreover, there was abundant evidence that [father] and [mother] were good parents who enjoyed a healthy relationship. There was no evidence of ongoing physical domestic violence between the parents; indeed there was no evidence of *any* physical domestic violence between the parents during their nine-year marriage. Neither parent had substance abuse problems, and there was no evidence that either suffered from mental health conditions, developmental delays or other social issues that often are at the root of dependency cases and might place children at continuing risk in the home. [Father] and [mother] were parents who started services at the earliest opportunity, showed progress in the services and had meaningful and productive visits with the children. Even [social services agency] participants in a team decision meeting early on in the case recognized [father] and [mother] were good parents.

"As noted above, there is no indication in the record that either parent ever personally inflicted any physical harm on Hailey, and the *only* evidence that either parent inflicted Nathan's eye injuries is disputed expert evidence that Hailey could not have done so. . . . The evidence was sufficient to support the court's determination, by a preponderance of the evidence, that as the sibling of an abused child, Hailey was at risk of future harm, and thus was appropriately found to be a dependent child. But the proof required to support the dispositional determination that Hailey should be removed from her parents' custody requires a greater degree of proof than merely by a preponderance of the evidence. Given all the circumstances presented here, the evidence with respect to the risk of harm to Hailey if she were not removed from the parents' home, does not so clearly satisfy the requisite 'clear and convincing' standard of proof." (*Hailey T.*, *supra*, 212 Cal.App.4th at pp. 147-148.)

C.    *Analysis*

Having carefully reviewed the evidence presented in this case and for the reasons that follow, we conclude that as in *Hailey T.*, the record does not support a finding that there was a substantial danger to Leonardo if he were to remain in father's care.

20

1. No clear and convincing evidence that Adrian's injuries were not caused accidentally

Noting that the coroner had ruled Adrian's death a homicide and that Adrian's treating physician was suspicious that father may not have been truthful, the juvenile court made a finding by clear and convincing evidence that Adrian's injuries were nonaccidentally caused. As we now explain, the record does not support this conclusion.

*Hospital records.* Adrian's hospital records state that the etiology of his injuries is "suspicious for nonaccidental trauma," and they reflect that doctors ordered a series of tests as part of a "complete . . . workup for nonaccidental trauma."[7] However, the hospital records do not report any conclusions regarding the doctors' initial suspicions of nonaccidental trauma. That is, although the records suggest Adrian's doctors were suspicious that Adrian's injuries were caused intentionally and ordered testing to attempt to determine how Adrian was injured, no doctor expressed the opinion that the tests confirmed their initial suspicions or established to any degree of medical certainty that Adrian was the victim of intentional abuse.

*Dr. Wong's statements.* Dr. Daphne Wong, Adrian's treating physician, told a CSW that father's account of dropping Adrian did not account for the extensive injuries he sustained and it was "suspicious" how much damage there was from such a short fall. However, when she was asked whether it was likely that Adrian's injuries were not accidental, Dr. Wong said, "We can't determine that." Similarly, when asked whether father had timely obtained medical treatment for Adrian, Dr. Wong said, "It's hard to say if the father did obtain treatment timely." Finally, Dr. Wong noted that some bruising was observed on Adrian's body when he was admitted to the hospital, but reported that she "cannot determine if bruising is a result of physical abuse or . . . caused during CPR efforts."

---

[7] We note that one of the tests the doctors ordered, a hematology consult to rule out bleeding disorders, remained pending on the day of Adrian's death and apparently was never completed.

21

*Coroner's report.* The coroner's report was similarly ambiguous as to the cause of Adrian's injuries. The coroner ruled Adrian's death a homicide, a determination that the juvenile court apparently interpreted as a conclusion that Adrian's injuries were intentionally caused. "Homicide" does not imply an intentional killing, however. Homicide " 'is the killing of one human being by another, either lawfully or unlawfully. Homicide includes murder and manslaughter, which are unlawful, and the acts of excusable and justifiable homicides, which are lawful.' " (*People v. Carter* (2005) 36 Cal.4th 1114, 1184, fn. 32, quoting CALJIC No. 8.00; see also Penal Code, § 195 [homicide is excusable "[w]hen committed by accident and misfortune . . . ."].) Accordingly, the coroner's classification of Adrian's death as a homicide meant the coroner believed Adrian's injuries were caused "by another"—something never in dispute in this case—but *not* that they were caused intentionally.

The coroner's report also does not demonstrate that Adrian suffered any injuries prior to December 7, 2013, the day he was brought to the hospital. Although the coroner's report refers to an "old" rib fracture, a subsequent microscopic examination of the fracture revealed it to have occurred 10-14 days before Adrian's death on December 17—i.e., on approximately the date of his hospital admission. The coroner's report estimates the retinal hemorrhages to have occurred at about the same time, i.e., 10-14 days before Adrian's December 17 death. Finally, the coroner's report references "possible older contusions" at the base of the bilateral frontal lobes of Adrian's brain and says that a neuropathology report was pending, but we have no record that the report was ever completed or received.

In short, although several doctors said they were suspicious that Adrian's injuries *may* have been intentionally caused, none opined that he or she believed they *had* been intentionally caused. To the contrary, when Dr. Wong was asked whether it was likely that Adrian's injuries were not accidental, she said, "*We can't determine that,*" and she was similarly unwilling to opine that father had not timely obtained medical treatment for Adrian. (Italics added.) Further, although the juvenile court held three separate hearings on the jurisdictional and dispositional issues, no doctor or medical expert ever testified.

22

As a result, the juvenile court did not have the benefit of a medical expert to interpret test results, explain their significance, or render an opinion on the ultimate question of whether Adrian had been the victim of intentional child abuse. Thus, although our record is replete with *suspicions* of child abuse, such suspicions fall well short of the high probability that the clear and convincing evidence standard requires.

*Family history.* The inconclusive nature of the medical evidence is particularly problematic when viewed in light of the entire record before the juvenile court. Leonardo was five-and-a-half years old at the time of the dispositional hearing and had lived with father since birth. He had received regular medical care from a pediatrician and attended preschool. Notwithstanding Leonardo's regular contact with mandated reporters, none had ever suspected child abuse. To the contrary, Leonardo's preschool teacher said he was a happy child who played well with other children and who had never reported any abuse or neglect. Further, a "suspected child abuse" examination conducted on January 14, 2014, found no evidence of abuse.

Leonardo's mother and teenage half-sister, Z., both said father had never been abusive toward any member of the family. According to mother, father was very "hands on" with the children and never seemed frustrated when caring for them, even when they cried. Z. said she did not know why father was being blamed for Adrian's injuries because "he has never hit him or us." Z. also said father took good care of her and her siblings, and she liked living with mother and father. Mother's parents were in accord: Both said they had known father for more than six years and had never seen him act in an abusive or inappropriate way towards his or any other children.

Finally, there was evidence that mother and father were loving parents who had a healthy relationship with one another. There was no evidence that either parent abused drugs, engaged in domestic violence, or had mental health issues that might put Leonardo at risk. In short, nothing in the family's history prior to December 7, 2013 suggested that father's conduct put his children at risk of physical abuse.

2. <u>The record requires a reversal of the dispositional order and a remand for additional proceedings</u>

This case is a difficult one, resulting as it does from the death of an infant under what doctors have characterized as suspicious circumstances. For the reasons stated above, however, we cannot affirm the dispositional order on the present inconclusive record. The statute requires *clear and convincing evidence of substantial danger* before a child can be taken from his parents' physical custody, and such clear and convincing evidence was not present here.

We are mindful of the fact that nearly a year has passed since the juvenile court entered its dispositional order, and thus there may be new information and evidence available to the parties and the court. We therefore remand this matter to the juvenile court with directions to hold a dispositional hearing under section 361, subdivision (c). We express no opinion as to the outcome of that hearing. Further, nothing in this opinion should be construed to prevent the court from considering new evidence or changed circumstances arising during the pendency of this appeal. To the contrary, we urge the parties to marshal the medical and other evidence that was lacking at the prior dispositional hearing.

Having concluded that the order removing Leonardo from father's custody must be reversed, we do not reach father's alternative contentions that the juvenile court erred in denying father reunification and/or enhancement services.

**DISPOSITION**

We affirm the order finding jurisdiction over Leonardo, but reverse the dispositional order removing Leonardo from father's custody. The matter is remanded to the juvenile court to conduct a new dispositional hearing guided by the principles set forth herein.


**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**



EDMON, P. J.


We concur:



KITCHING, J.



EGERTON, J.[*]

---

[*]    Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.